FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA
_____

No. 1D17-2238
_____

PHILIP P. OLDHAM,

  Petitioner,

  v.

HILLARY E. GREENE,

  Respondent.

_____

Petition for Writ of Certiorari—Original Jurisdiction.
Mary Polson, Judge.

December 27, 2018


M.K. THOMAS, J.

  Philip Oldham ("Father") seeks certiorari review of an order compelling him to undergo psychological testing as part of dissolution of marriage and custody proceedings with Hillary Greene ("Mother"). He argues the order is a departure from the essential requirements of law, because: 1) it does not meet the "in controversy" and "good cause" requirements of Florida Family Law Rule of Procedure 12.360; and 2) it does not specify the manner, conditions, and scope of the examination. We agree and grant the petition.

## I. Facts

  In 2017, Father petitioned for dissolution of the parties' marriage. In response, Mother filed an Answer and Counter-

Petition for Determination of Paternity and answers to standard family law interrogatories. Standard Interrogatory 6(c) inquires, "[i]f the mental or physical condition of a spouse or child is an issue, identify the person and state the name and address of all health care providers involved in the treatment of that person for said mental or physical condition." In her answers, Mother did not identify the mental condition of Father as being at issue in the proceedings.

About a month later, Mother filed a "Motion for Social Investigation of Father" pursuant to "section 61.20, Florida Statues; and rule 12.360, Florida Family Law Rule of Procedure." She alleged Father had "uncontrolled fits of explosive rage manifested in screaming and other violent behaviors in the presence of the child." She maintained Father's mental health was detrimental to the child; specifically, his inability to control his temper lead to "explosive fits of rage," which included screaming and threats to damage personal property. Mother claimed Father was unable to "put the needs of the child above his." The alleged offensive behavior by Father did not occur in the window of time between the Mother's answers to interrogatories and her filing of the Motion for his evaluation, but predated it all. In the Motion, Mother asserted that Father's mental health should be evaluated to assist the trial court in determining a parenting plan which was in the best interest of the child.

When the motion hearing began, Father's counsel requested clarification on the request for mental health testing as follows: "Is [Mother] asking for a psychological analysis of [Father] or is she asking for a social investigation of the parties?" Mother's counsel answered, "[b]oth." Counsel continued, "we would like a psychological evaluation, but we would take a social investigation." Mother requested the trial court order supervised timesharing, every other weekend for Father.

The only witnesses at hearing were Mother and Father. Mother described being fearful and afraid. Mother testified Father would throw things around the garage. If he experienced computer issues, he would wield a golf club and stomp around spewing profanity. She further described uncontrollable fits of rage resulting from "anything" such as a dog barking outside, someone

2

at the door or watching a Clinton-Trump debate. She expressed concern that the child might mimic Father's behavior and that Father could not parent the child by himself. On cross-examination, Mother acknowledged Father had not been arrested in the last ten years, had never been Baker Acted, reported for domestic violence nor reported to children and family services.

Father testified he had no history of psychological problems and denied lashing out in fits of rage or yelling at the child. He described his historical role as the primary caregiver in the home while Mother went back to school and worked. Father denied any need for supervised visitation and clarified he sought sole custody of the child.

At hearing, the trial court determined that Mother's motion constituted a request for a psychological examination under rule 12.360, rather than a request for social investigation under section 61.20, Florida Statutes. Regardless, on May 4, 2017, the trial court entered an "Order On Motion For Social Investigation Of Father," but within the pleading granted a compulsory evaluation pursuant to rule 12.360. Mother was to select a psychologist to perform the evaluation and pay the initial cost. The court orally detailed the purpose of the evaluation was to "namely address whether or not [Father] has an anger problem and whether or not that affects his ability to parent," but this was not included in the order. Until the evaluation was completed, the court ordered temporary majority timesharing for Mother and unsupervised, overnight timesharing every other weekend with Father. The order simply noted Mother "met her burden of an initial showing that the Father's mental health [wa]s in controversy and that good cause exist[ed]," but no factual findings were included. It further allowed each party to submit information for the psychologist to consider, with the exception of one-party consent audio recordings. In response, Father filed a petition for writ of certiorari seeking to quash the order compelling his psychological evaluation.

## II. Analysis

Certiorari first requires material injury not remediable on plenary appeal; this is a threshold, jurisdictional requirement. *See State, Dep't of Revenue v. Hartsell*, 189 So. 3d 363, 364-65 (Fla. 1st

3

DCA 2016). Ordering a compulsory medical examination meets the jurisdictional threshold. *J.B. v. M.M.*, 92 So. 3d 888, 889 (Fla. 4th DCA 2012). Next, and at issue here, the petitioner must demonstrate a departure from the essential requirements of law by showing the order violates clearly established principles of law resulting in a miscarriage of justice. *Hartsell*, 189 So. 3d at 365. We find Father has met his burden.

Courts have two available avenues to compel the psychological evaluation of a party in a family law case: 1) as part of a social investigation pursuant to section 61.20, Florida Statutes; and 2) pursuant to Florida Rule of Civil Procedure 1.360 and its companion Family Law Rule of Procedure 12.360. *See Russenberger v. Russenberger*, 639 So. 2d 963, 965 (Fla. 1994). However, "parties are entitled to know whether the court is proceeding under the rule or the statute." *Id.* at 965. Here, the order references Mother's motion for "social investigation," but ultimately grants the psychological evaluation under rule 12.360.

### A. Rule 12.360[1]

Pursuant to rule 12.360, a request for a psychological examination must be related to "a matter in controversy," and the party must have "good cause for the examination." Fla. Fam. L. R. P. 12.360(a)(1),(2). The requesting party has the burden to satisfy the "in controversy" and "good cause" prongs. *Manubens v. Manubens*, 198 So. 3d 1072, 1074 (Fla. 5th DCA 2016); *see also* Fla. Fam. L. R. P. 12.360(a)(1),(2). A court's failure to make *any* findings as to the requirements of rule 12.360 is a departure from the essential requirements of law. *See Russenberger v. Russenberger,* 623 So. 2d 1244, 1245-46 (Fla. 1st DCA 1993), aff'd

---

[1] As of March 16, 2017, the Florida Supreme Court adopted a more comprehensive rule related to examinations in the family law context. *See In re Amendments to Florida Family Law Rules of Procedure*, 214 So. 3d 400, 407 (Fla. 2017). Formerly, rule 12.360 simply referred to the rule of civil procedure, 1.360, that permitted examination of parties. *Id.* at 446. Presently, and at the time Mother filed her request, rule 12.360 provides an updated framework specifically applicable to family law.

639 So. 2d 963 (Fla. 1994); *Manubens*, 198 So. 3d at 1074-75; *cf. Wade v. Wade*, 124 So. 3d 369, 375 (Fla. 3d DCA 2013) (explaining the complete failure to address a requirement "alone may be sufficient to overturn the trial court's order").

*"In Controversy"*

Seeking custody, in and of itself, does not place the parent's mental condition "in controversy," *Wade*, 124 So. 3d at 375, nor is "mere relevance to the case" sufficient. *Russenberger*, 623 So. 2d at 1245. The mental condition alleged "must directly involve a material element of the cause of action." *Williams v. Williams*, 550 So. 2d 166, 167 (Fla. 2d DCA 1989). There must be "verified allegations that the parent in question is having mental problems that could substantially impact his or her ability to properly raise children." *Wade*, 124 So. 3d at 375; *see also Asteberg v. Russell*, 144 So. 3d 606, 608 (Fla. 2d DCA 2014) (a belief the primary residential parent is not supporting and promoting the child's relationship with the other parent did not put mental health in controversy); *Williams,* 550 So. 2d at 167 (claims a father failed to use a car seat for the child, that the child wet his pants after a visit with the father, and that the father used bad language in front of the child and was unstable were insufficient to put the father's mental health in controversy). Mental health has been declared "in controversy" where a father seeking parental responsibility made comments to a minor child that he was contemplating suicide. *Barry v. Barry*, 159 So. 3d 306, 307-08 (Fla. 5th DCA 2015). Baker Act proceedings or a diagnosed schizoaffective disorder can place mental health in controversy. *Bailey v. Bailey*, 176 So. 3d 344, 346-47 (Fla. 4th DCA 2015); *J.B.*, 92 So. 3d at 890.

Mother fails to cite cases analogous to the instant appeal. Instead, she relies heavily on the fact the parties disagreed over the parenting plan and Father seeking sole custody, which alone is insufficient to trigger a rule 12.360 examination. *Wade*, 124 So. 3d at 375. The focus of rule 12.360 is not on good or bad parenting, but on something larger, some greater indicator of deeper mental health concerns. With no actual violence to a person or threat of violence to a person, Father's alleged actions could be irresponsible and rash reactions to frustration with his current circumstances. However, those actions, while not preferable, may not rise to the

5

level of significant mental health concerns warranting an intrusive evaluation. The burden of proof is heightened when the party subject to the request for an examination has not voluntarily placed that issue in controversy. *Wade,* 124 So.3d at 373. Just a month prior to requesting the mental examination, Mother filed her verified answer to an interrogatory in which she failed to identify that Father's mental health was at issue.[2] Moreover, the trial court granted Father unsupervised timesharing, which would not have occurred if a true concern about Father's mental condition existed.

*"Good Cause"*

Even if the prong of "in controversy" is satisfied, the requesting party must also show "good cause" for a psychological examination. "Good cause" requires that a party's mental condition "[can] not adequately be evidenced without the assistance of expert medical testimony." *Fruh v. Dep't of Health & Rehab. Servs.*, 430 So. 2d 581, 584 (Fla. 5th DCA 1983), cited in *In the Interest of S.M.B.*, 597 So. 2d 848, 852 (Fla. 1st DCA 1992). Good cause "should be based on evidence that the parent has been unable to meet the needs of the children.*" Nobbe v. Nobbe*, 627 So. 2d 59, 60 (Fla. 2d DCA 1993). The requesting party must show that the alleged mental illness places the child "at risk of abuse, abandonment or neglect." *J.B.*, 92 So. 3d at 890; *see also Schottenstein v. Schottenstein*, 384 So. 2d 933, 936 (Fla. 3d DCA 1980) (finding that children being "sometimes upset when they returned from a visitation with their father" and father's "desire to give his children a sense of value about money" were insufficient to show good cause for psychological evaluation). In addition, it belies good cause to believe a party's mental status would

---

[2] Although family law rule 12.360 and rule 1.360 are similar, their application is dependent on claims raised or abandoned. For example, a Plaintiff may raise mental anguish as a basis for damages in a cause of action in tort. In that context and under rule 1.360, the mental condition would be a matter "in controversy" unless withdrawn. *See Maddox v. Bullard*, 141 So. 3d 1264 (Fla. 5th DCA 2014); *Olges v. Dougherty*, 856 So. 2d 6, 12 (Fla. 1st DCA 2003).

jeopardize a child's well-being, where a court orders a psychological evaluation and also awards continued timesharing, unsupervised and overnight, with that party. *See Wade*, 124 So. 3d at 376-77.

Here, the evidence before the trial court failed to show "good cause" that Father could not meet the needs of the child or that his mental instability, if shown, would have an effect on the child. Because the order under review is void of any factual findings and states only, "[t]he Mother has made met [sic] her burden of an initial showing that the Father's mental health is in controversy and that good cause exists for the mental health evaluation," we have no insight into factors relied upon. Further, the trial court ordered continued unsupervised visitation with Father over weekends. Thus, the court must not have believed his mental status would harm the child. Additionally, Mother stated she and her elder daughter were fearful of Father, but confirmed he did not threaten her or the child and was not violent with them. Father's cursing and outbursts are certainly not advisable, but this behavior does not establish that Father is unable to meet the needs of the child or places the child at risk.

A forced psychological examination has serious privacy implications; people have the right to be free from compulsory examination absent circumstances meeting the requirements. *In the Interest of T.M.W.*, 553 So. 2d 260, 263 (Fla. 1st DCA 1989) (quoting *Schottenstein*, 384 So. 2d 933). The Florida Supreme Court has cautioned against the use of mental health evaluations as vindictive tools in family law cases. *See Russenberger*, 639 So. 2d at 966 ("A parent's request for a psychological evaluation may well be an expression of that parent's vindictiveness and could have the effect of making the child a victim.").

In sum, the use of compelled psychological examinations must be carefully scrutinized and courts have historically required a showing of significant mental health issues directly impacting a parent's ability to raise their child. Here, Father's actions may well be ill-advised, but they fall short of showing a significant mental

health issue for which the court may compel a psychological examination under rule 12.360.[3]

*B. Scope of the Examination*

Finally, even if Mother met her burden of proving "in controversy" and "good cause" under rule 12.360, the order remains deficient as it fails to provide sufficient parameters regarding the examination. In orders compelling examinations, the trial court must set forth "the time, place, manner, conditions, and scope of an examination and the person or persons by whom it is to be made." Fla. Fam. L. R. P. 12.360(a)(1)(b); *Manubens*, 198 So. 3d at 1075.

Open-ended orders that do not provide specific directives regarding the psychological evaluation depart from the essential requirements of law. *See id.* at 674-75 (an order that stated the "evaluation should include determining if the Wife is capable of having [a] successful and positive homeschooling environment and further, if she is capable of performing the duties effectively to continue homeschooling the children" was not specific and detailed enough); *Barry*, 159 So. 3d at 308 (an order stating to evaluate "the safety of the children while in Petitioner's custody," was not sufficient; it did not "identify the length of the examination, the type of testing, or whether the testing is limited to 'methods

---

[3] Mother's argument that the evaluation could have been ordered as a social evaluation under section 61.20, Florida Statutes, is without merit. The trial court rejected Mother's request for a social investigation. Mother did not appeal from the rejection of her alternative statutory claim. Accordingly, this argument was not preserved. We also disagree with Mother's argument that section 61.13, Florida Statutes, provides a third, independent avenue to order a psychological evaluation. The statute does not provide the court with the power to order an examination; rather, it merely sets forth an element the court must consider when determining parental responsibility and time sharing. *See* § 61.13(3), Fla. Stat.; *Gordon v. Smith*, 615 So. 2d 843, 845 (Fla. 4th DCA 1993) ("If section 61.13 supplies the relevancy, then section 61.20, Florida Statutes (1991), furnishes the specific tool.").

routine to the profession'"). Courts have even tied particularity to the "good cause" requirement, explaining that without a proper scope of the requested examination, the court is not able to determine if there is good cause for that particular examination. *Id.* The failure of an order to specify the manner, conditions, and scope of an examination creates a "carte blanche" scenario for the psychologist to perform any type of psychological inquiry, testing, and analysis. *Maddox v. Bullard,* 141 So. 3d 1264, 1266 (Fla. 5th DCA 2014). Here, the order is devoid of any limits on or instructions for the evaluation. Thus, it departs from the essential requirements of law by failing to meet the requirements of rule 12.360.

## III. Conclusion

The order compelling Father to undergo a psychological evaluation pursuant to rule 12.360 is a departure from the essential requirements of law. The trial court failed to provide any factual findings as to the requirements of "in controversy" and a showing of "good cause" for the evaluation. The order is also facially inconsistent in permitting continued unsupervised, overnight timesharing with Father while finding "good cause" to compel him to undergo a mental health examination. Lastly, the order is deficient as the trial court failed to address the required elements of manner, conditions, and scope of the examination.

Accordingly, we grant Father's petition and quash the trial court's order compelling his psychological evaluation.

Petition GRANTED.

LEWIS, J., concurs; KELSEY, J., dissents with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

9

KELSEY, J., dissents.

I respectfully dissent, in part. I agree with the majority that we have jurisdiction and that these parties and the lower tribunal need to get the procedures right, including specifying the scope of psychological evaluation of the Father. Further, the analysis should focus on *present* ability to parent, and thus on remand the issues should be evaluated in light of current information. *Zarzaur v. Zarzaur*, 213 So. 3d 1115, 1118-19 (Fla. 1st DCA 2017). As to the core substantive question of whether the Father's behavior justified intrusion into his mental health, however, the record reflects competent, substantial evidence sufficient to support the trial court's order requiring the Father to undergo psychological testing.

The Mother here alleged as follows:

The Father has engaged in the following behaviors in presence of the minor child:

A. [The Father] is unable to control his temper which manifests as explosive fits of rage;

B. [The Father] engages in screaming, threats to damage the parties' personal property with a golf club and other violent behaviors in the presence of the child;

C. [The Father's] fits of rage are unpredictable and there is no known trigger causing the outbursts to be spontaneous and frightening for [the Mother] and the child.

Under oath, the Mother testified as follows:

Mr. Oldham frequently and bi-frequently – daily and multiple times daily would go into fits of rage, anger, explosive yelling, cussing, terrible vulgar language. My daughter, who is the older child, is now in counseling because of emotional distress that he caused her. . . . She experienced and witnessed – we both did – and

10

so did my son, many, many multiple – every day -- . . . rage, screaming. . . . I believe – the 20th of January, I think, was the one that was in the garage. . . . This is about a week before I left. . . . He was – his bike that he hooked up to his TV wasn't picking up that TV or that Apple TV, and he was screaming and losing it and throwing things in the garage. My daughter was terrified. She came to me and begged me why. Why is he angry again? . . . I was scared. . . . My son was in the room and present and heard it. . . .

He was throwing items around in the garage. He was screaming obscenities. . . . Fuck this thing. You can't fucking work here. You can't get this out here? You fucking dick licker. You pickle dick. You fuck – you fuck – mother fucker. This is what he was screaming and screamed frequently. . . . [Q Does that happen at least once a day?] Absolutely. [Multiple times a day?] Yes. . . . I do not want my son learning to speak this as his first words. I do not want my son to learn to act like this and to be rageful and angry. I was fearful myself. . . . I was fearful, and that's why I left the way that I did because of his rage that he exhibited daily. I was afraid if I told him I was leaving, that it would go from the verbal and emotional abuse stage to the physical, and I was afraid. . . . At that time, he was throwing tools and things that were in the garage. And, yes, he was throwing items around in the garage. . . . Tools from his toolbox and things that were laying on top of his toolbox. . . . Like, a wrench. Like, you know, the remotes to the TV thing. He was throwing things from – the thing from his bike around. I mean, these were – you know, this is what was common for him. . . .

[Q Can you recall specifically another incident where he exhibited such behavior?] Yes. . . . His computer was not loading properly, and he would enter into fits of rage directly in front of my son. He was in the room. He was wielding a golf club around saying, it's taking everything I can to fucking not smash this fucking computer with this fucking golf club. This fucking piece of shit. Give me the fucking virus. I just – fuck it all. Fuck it all. I can't get the fucking web page. Over and over constantly for, you know – this went on for probably thirty or forty-five minutes in front of my son while my son was having breakfast.

The mother also testified to similar outbursts arising out of computer issues; another during the Trump-Clinton debate; and others triggered by a dog barking, a friend of the Mother's coming to the door, and her daughter's wanting to play in the living room--all occurring in the presence of the minor children: "[A]nything and everything is a trigger for him." The Mother testified that as the Father's fits of rage got worse, she changed her work schedule and made child-care arrangements so that her daughter would not have to be alone with the Father, and ultimately took the children and herself out of the home because of the Father's conduct.

The Father at first generally denied engaging in fits of rage, but did admit to what he called incidents of "frustration with his computer." He distinguished his behavior as not being "directed at" the children, but did not deny that they witnessed it.

The trial judge found this evidence sufficient to justify a psychological evaluation of the Father, and did not depart from the essential requirements of law or create a miscarriage of justice in so finding. The Father's behavior was significant and extremely troubling. The Father's behavior would be sufficient to support a domestic violence injunction. *See* Fla. Fam. L. R. P. 12.980(a) (listing destruction of "personal property, including, but not limited to, telephones or other communication equipment, clothing, or other items belonging to the [victim]" as a general category of behavior qualifying for an injunction). Court-Appointed

Parenting Coordinators are required to monitor cases for domestic violence incidents and "take appropriate action to address any safety concerns." Fla. R. Qual. & Ct.-App. Parenting Coords. 15.180(a). The Florida Bar has suggested attorneys ask clients in domestic abuse situations "Has your partner ever destroyed things that you care about, broken furniture, thrown things, or hurt your pets?" The Florida Bar's Fastrain, *Injunctions for Protection Against Domestic Violence* (2006 ed.). A legal basis for a domestic violence injunction is a very strong indicator of a serious mental health issue warranting professional evaluation in the parenting context. *See also, e.g., J.Y. v. Dep't of Child. & Fams.*, 10 So. 3d 168, 170 (Fla. 5th DCA 2009) (finding evidence of domestic violence and ongoing angry outbursts in presence of child, together with other evidence, supported termination of parental rights); *J.P. v. Dep't of Child. & Fams.*, 855 So. 2d 175, 176-77 (Fla. 5th DCA 2003) (On Motion for Rehearing) (holding trial court properly ordered father to submit to psychological evaluation due to prior incidents of domestic violence and a criminal history of violence).

The Father's mental condition was in controversy with respect to establishing a timesharing schedule for the minor child. The Mother's sworn testimony, which the Father in very substantial part did not dispute, established good cause for the examination because it demonstrated mental issues "that could substantially impact [the Father's] ability to properly raise children." *See Wade v. Wade,* 124 So. 3d 369, 375 (Fla. 3d DCA 2013). The evidence thus supported the trial judge's decision to require a psychological examination of the Father. *See* Fla. Fam. L. R. P. 12.360.

———————————————

Brian P. North of Kenny Leigh & Associates, Fort Walton Beach, for Petitioner.

Jill W. Warren of the Law Office of Jill W. Warren, PLLC, Pensacola, for Respondent.